# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| GRAND ENTERPRISES, LLC, | |
| Plaintiff, | No. 21-1855C |
| v. | Filed: August 14, 2026 |
| THE UNITED STATES, | Re-issued: September 25, 2026* |
| Defendant. | |

## OPINION AND ORDER

In this contract dispute, Plaintiff Grand Enterprises, LLC ("Grand") asserts a claim for $6,827,242.09 in damages for its performance of a construction contract with the Department of Veterans Affairs ("VA") to expand the parking garage at the Salt Lake City VA Medical Center in Salt Lake City, Utah. Grand seeks equitable adjustments for changes, suspensions of work, Type I differing site conditions, and breach of the covenant of good faith and fair dealing. After denial of its certified claim, Grand filed suit here under the Contract Disputes Act ("CDA"). Before the Court is the Government's Motion for Partial Summary Judgment. The Government argues that Grand is not entitled to recover damages for work that was required by the contract and that Grand is barred from asserting claims that it released through bilateral contract modifications or that are not permitted by regulation. The Government further claims that Grand has failed to establish causation for and failed to substantiate the amount of the alleged damages. For the reasons outlined below, the Court **GRANTS IN PART** and **DENIES IN PART** the Government's Motion.

* The Court issued this opinion under seal on August 14, 2026, and directed the parties to file any proposed redactions by August 21, 2026. As the parties did not propose any redactions, the Court reissues the opinion publicly in full.

# I. BACKGROUND

## A. Statutory and Regulatory Background

Before bringing a CDA action in this Court, a contractor with a contract dispute against the federal government must submit a certified claim to the contracting officer ("CO") for decision. 41 U.S.C. §§ 7103(a)(1), 7104(b)(1). The CDA further requires "that the claim be in writing, and that the contractor certify claims over $100,000." *Northrop Grumman Computing Sys. v. United States*, 709 F.3d 1107, 1112 (Fed. Cir. 2013) (citing 41 U.S.C. §§ 7103(a)–(b)). The Federal Acquisition Regulation ("FAR") defines a claim as: "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract."[1] FAR 2.101; *see* FAR 52.233-1(c). The United States Court of Appeals for the Federal Circuit has held that a CDA claim "must contain 'a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.'" *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (quoting *Contr. Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1997)); *see Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003).

If the CO issues an adverse decision on the certified claim, the contractor may "bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary." 41 U.S.C. § 7104(b)(1). The contractor must file any such action within 12 months from the date it receives the CO's decision.

[1] Because a "claim" is not defined by the CDA, the Court looks to the definition supplied by the FAR. *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (citing *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575 (Fed. Cir. 1995) (en banc)).

*Id.* § 7104(b)(3). CDA claims are reviewed de novo by the Court. *Id.* § 7104(b)(4); *see Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1562 (Fed. Cir. 1990).

## B. Factual Background

The VA issued Solicitation No. VA259–16–R–0013 ("Solicitation") on March 10, 2016, for the expansion of a VA Medical Center parking garage ("Project"). App. 1, ECF Nos. 31, 36, 41.[2] The Project was located at the George E. Wahlen VA Medical Center in Salt Lake City, Utah. *Id.* The purpose of the Project was to expand the Medical Center's parking garage by adding one story, horizontally expanding the ground floor, and installing a new roof. App. 5. The VA awarded the contract to Grand, a small business co-owned by Todd Grandstaff and his wife, Tammy Grandstaff, on September 28, 2016. App. 2, 193 (Grandstaff Dep. Tr. at 11:15).

The Statement of Work ("SOW") sought a general contractor to "provide all labor, materials and equipment as necessary to construct a post-tension cast-in-place, concrete expansion of an existing open parking structure." App. 5. The SOW noted the changes to be made through the expansion, such as expanding the footprint of the garage, building a new roof, and adding an additional floor to the top of the garage. *Id.* Contract Line Item Number ("CLIN") 0001 of the contract indicated a firm-fixed price of $8,377,045.00. App. 6. CLIN 0001 stated that:

> Work will include all general construction, alterations, roads, curb, gutters, walks, grading, drainage, landscaping, mechanical, fire protection, technology and electrical work, extensions and alterations to utility systems, elevators, stairwells, rooftop equipment and, any and all necessary removal, modifications, demolition, alterations of existing structures and construction and certain other items to construct the complete project.

*Id.*

[2] For ease of reference, citations to the Appendix refer to the bates-labeled page numbers rather than the ECF page numbers. The Appendix spans two different filings: the Government's amended appendix (pages 1–606), ECF No. 31 (sealed), and Grand's appendix (607–1347), ECF No. 36 (sealed). The Government additionally filed a supplement to the amended appendix with its reply brief, ECF No. 41 (sealed). Citations to that supplement appear as "Suppl. App."

Prior to contractors submitting bids, the VA held a site visit on March 17, 2016. *See* App. 143. Grand admits that its employees, Rusty Wadsworth and Brandon Wangsgaard, attended. App. 221 (Grandstaff Dep. Tr. at 39:17–19). The parties dispute whether Mr. Grandstaff personally attended. *See* App. 221 (Grandstaff Dep. Tr. at 39:20–22), 438 (Jimenez Dep. Tr. at 55:17–23). Michael Jimenez, who was the contracting officer's representative ("COR") for the VA at the time, hosted the site visit. *See* App. 435 (Jimenez Dep. Tr. at 12:15–20), 438 (Jimenez Dep. Tr. at 55:6–13). Mr. Jimenez testified that he invited the attendees to inspect and ride the elevator, and he offered for them to "go up on the roof in the open hatch" to "inspect" it. App. 441 (Jimenez Dep. Tr. at 58:10–11). At the site visit, contractors posed a couple of questions about extending elevator service to the new floor, and Mr. Jimenez suggested that potential bidders submit any questions online to the CO. App. 440 (Jimenez Dep. Tr. at 57:9–19). Mr. Jimenez emphasized that he did not instruct any contractor that the elevator was out of scope or already completed. App. 443 (Jimenez Dep. Tr. at 60:9–17).

Upon being awarded the contract, Grand was to begin work within 10 calendar days of receiving the notice to proceed. *See* App. 1. The effective date of the notice to proceed—which triggered a 360-day deadline for Grand to complete the Project—was November 14, 2016. App. 224 (Grandstaff Dep. Tr. at 42:7–19). The contract thus contemplated that the construction would be complete about a year later—by November 9, 2017. *Id*. As described below, the Project was not substantially complete until January 17, 2020, almost two years beyond the original scheduled completion date. App. 858.

Grand hired several subcontractors to complete the Project. Wadsworth Brothers completed the structural concrete work. App. 335 (Grandstaff Dep. Tr. at 153:14–17). Recon Structures completed the Project's steel-related work. App. 335 (Grandstaff Dep. Tr. at 153:20–

21), 561 (Wangsgaard Dep. Tr. at 39:6–8). L&L Erection & Fabrication supported metal work in coordination with Recon Structures. App. 335 (Grandstaff Dep. Tr. at 153:20–21). Intermountain Inspectors and Bragg Crain also supported Recon's work. App. 541, 585 (Wangsgaard Dep. Tr. at 128:3–12). BML Services, LLC worked as a plumbing subcontractor. App. 337 (Grandstaff Dep. Tr. at 155:15–16), 1169. Thyssenkrupp performed elevator work. Suppl. App. 78–79. CMT Engineering Laboratories conducted safety tests related to the soils, asphalt, concrete, masonry, grout, and structural steel. *See* App. 1342–43. Finally, Rodac completed roofing-related tasks including joint sealants. App. 336 (Grandstaff Dep. Tr. at 154:9–10). Grand and Rodac executed a release agreement for outstanding debts on December 22, 2020, *see* App. 599, but there is no evidence in the record of any other release agreements between Grand and its other subcontractors.

After beginning work on the Project, Grand noticed discrepancies between the construction plans and the reality of the existing structure and began submitting Requests for Information ("RFI") to receive guidance from the VA about how to handle these issues. App. 590–91 (Wadsworth Dep. Tr. at 12:22–13:12); *see, e.g.*, App. 1207. Over the course of the Project, Grand submitted 239 RFIs. App. 263 (Grandstaff Dep. Tr. at 81:15–16)

Grand also submitted change order requests for work that Grand believed the contract did not cover but that would be necessary to complete the Project. *See* App. 284 (Grandstaff Dep. Tr. at 101:6–10); *see also, e.g.*, App. 89, 92, 95. Grand and its subcontractors submitted approximately 65 change order requests to the VA over the course of the Project. *See* App. 92. Several change order requests were incorporated into the contract through bilateral contract modifications, such as the adoption of Change Order Request 56 into Modification P00006 to resolve issues related to the "column bump-outs," which are the supplemental structural supports for the garage. App. 96. Most relevant to the present dispute are Change Order Requests 32, 33, 52, and 56. The VA denied

Change Order Request 33, which related to the cost of lowering the roof. *See* App. 278–79 (Grandstaff Dep. Tr. at 96:24–97:24). Similarly, since the VA and Grand disagreed on whether extension of the elevator service was within the scope of the contract, there was no bilateral modification to resolve this issue, and Change Order Requests 32 and 52 were also denied. *See* App. 278–79 (Grandstaff Dep. Tr. at 96:24–97:6), 492.

The Project included multiple phases. In an effort to compensate for delays in the first phase, Pour One, Grand began potholing for caissons and quickly found duct banks "directly or immediately adjacent." App. 148. The duct banks represented, in Grand's view, a differing site condition, and Grand submitted an RFI on March 29, 2017, for guidance on next steps. *Id.* During a meeting on April 5, 2017, the VA agreed to search for documentation related to any prior work on the existing duct banks. *Id.* Grand's subcontractor, Wadsworth Brothers, and Guidon, the VA's Architect of Record, went back and forth with proposed drawings in May 2017. *Id.* In mid-June 2017, Grand—in consultation with Wadsworth Brothers—decided to proceed with placing footings and columns at the location it had identified, as it had not heard from the VA. *Id.*

Over the course of the Project, the issues that Grand experienced resulted in numerous delays as Grand and the VA corresponded through RFIs, change order requests, and, in some instances, contract modifications. For instance, when Grand commenced excavation to expand the parking structure during Phase Four, it discovered problems with the existing footings. App. 149. Grand submitted seven RFIs between June 22, 2017, and August 2, 2017, regarding the issues with the Phase Four footings. *Id.*

Another source of delay and dispute was the extension of elevator service. The SOW instructed that the expansion of the parking garage would utilize the existing elevator. App. 5. Thus, to make the new top floor of the parking garage accessible, the existing elevator needed to

be extended. The parties dispute whether the scope of CLIN 0001 required Grand to deliver that elevator extension as part of the contract. *Compare* App. 151, *with* App. 851. The parties also dispute whether the pre-bid site visit on March 17, 2016, included access to the elevator area. *Compare* App. 151, *with* App. 438–39 (Jimenez Dep. Tr. at 55:14–56:7). Grand subsequently entered into a payment plan with Thyssenkrupp to pay the cost of the elevator work (approximately $281,000) over time. App. 404–05 (Grandstaff Dep. Tr. at 222:20–223:15); Suppl. App. 78–79.

Additional delays occurred due to disagreements regarding the appropriate level of mechanical roughing required of the shear walls and who was responsible for that work. *See* App. 860. On November 6, 2017, the VA informed Grand via letter that Grand was "required to hire a structural engineer to design a remedy to account [f]or the structural support loss" caused by Grand's failure to sufficiently roughen the footing of the shear wall. *Id.* Grand and its subcontractor, Wadsworth Brothers, responded to the letter denying the VA's assertion and requesting proof that the work was not performed correctly. *Id.* Grand excavated the footing with the CO and COR present on December 5, 2018, which is when the CO and COR determined that the footing was not properly roughened. *Id.* Grand maintained its position that the work had been completed correctly. *Id.* Grand, however, completed the work per the VA's direction under protest. *Id.*

Over the course of the Project, the parties agreed to multiple bilateral contract modifications, four of which are at issue in this dispute: Modifications P00002, P00003, P00005, and P00006. App. 86–88, 89–91, 92–94, 95–101. Modification P00002 increased the total contract value by $11,229.37 to incorporate "column extensions and cable barrier" into the SOW to protect and support the vehicle ramp in the garage and protect vehicles driving on the ramp. App. 86–88. Grand first discovered that there was no connection point between the existing ramp

and the ramp above and submitted an RFI covering construction of that connection on January 23, 2017. App. 143. The modification became effective on November 13, 2017, and did not include an extension of the contract period. App. 86–88.

Modification P00003 increased the total contract value by $37,990.85 and extended the contract period by 10 calendar days. App. 89. The modification incorporated Change Order Requests 4, 5, 6a, 10b, 11a, 11b, 12, 16, 18, 22, 23, 25, 36, 41, 44, and 49. *Id.* The incorporated requests related to unforeseen site conditions and design omissions, including removing and replacing cracked asphalt, extending conduits from the "S&C switch installation project," switching to an alternative security camera, adding additional rebar layers, and cutting and connecting new footing through the retaining wall. App. 89–90. The modification became effective on August 7, 2018. App. 89.

Modification P00005 increased the total contract value by $105,787.83 and extended the contract period by 37 calendar days. App. 92. The modification incorporated Change Order Requests 15a, 24, 29, 35, 53, 59, 60, 61, 62, 64, and 65. *Id.* These changes included expanding existing footings, adding additional roof drains, changing the pour sequence, and replacing forms in the elevator framework. App. 92–94. The modification was effective March 28, 2019. App. 92.

The final modification at issue, Modification P00006, increased the total contract value by $308,979.97 and extended the contract period by 90 calendar days. App. 95. This modification primarily focused on repairs to the column bump-outs associated with Change Order Request 56. App. 95–96. Guidon, the VA's project manager and engineer for the Project, issued final drawings addressing the bump-out fix. App. 97–101. Modification P00006 became effective June 5, 2019. App. 95.

Grand obtained loans and lines of credit to finance the additional costs that arose over the course of the Project. App. 174. Grand took out loans totaling $1,037,500 and incurred interest and fees amounting to $277,939.32. *Id.* This financing was used to fund work on the "elevator roof, lowering the roof, the extra two years [and] two months, roughly, of on-site supervision that wasn't included, just general cost to the project." App. 414 (Grandstaff Dep. Tr. at 232:17–19). In addition, Grand experienced fluctuations in its bonding capacity between 2016 and 2020. *See* App. 376–79 (Grandstaff Dep. Tr. at 194:4–197:6).

Beyond the costs discussed above, Grand also allegedly incurred increased overhead costs due to the expanded scope of work and delays. *See* App. 172–73. Grand characterized these as "Other Direct Costs," which included project management labor costs, field support, temporary facilities, and other items associated with the delays experienced on the Project. *See* App. 138, 141. Grand billed hourly rates of between $35 and $110 for its project management staff. App. 141. During the Project, Grand increased Mr. Grandstaff's hourly rate from $85 to $110. App. 270 (Grandstaff Dep. Tr. at 88:7–10). Grand also claimed additional equipment costs, associated with its use of trucks on site, because of the Project delays. App. 140.

As a result of the multiple bilateral contract modifications, including those discussed above, the modified completion date of the Project was extended to April 18, 2018. App. 95, 859. The substantial completion date of the Project did not ultimately occur until January 17, 2020. App. 858. On April 29, 2020, Grand filed a Request for Equitable Adjustment ("REA") with the VA. *See* App. 104. In the REA, Grand detailed the timeline of events regarding the Solicitation, the first concrete pour, cracking and separation of column bump-outs, caissons, Phase Four footings, roof elevation, elevator, and mechanical roughing, and it requested an adjustment of $6,827,242.09 to compensate Grand for these additional costs. *See* App. 104–18, 138. Grand

attached a Change Proposal, with accompanying worksheets, to itemize its claimed costs. App. 138–42. In November 2020, the parties unsuccessfully attempted to mediate the REA with the Civilian Board of Contract Appeals. *See* App. 851.

On December 20, 2020, Grand submitted a certified claim to the VA, requesting $6,763,423.55 because of "changes, suspensions of work, differing site conditions, breaches of the implied duty of good faith and fair dealing, and material breaches of contract." App. 143. That claim was denied on March 24, 2021. App. 861.

### C. The Instant Litigation

Grand filed suit in this Court on September 14, 2021. *See* Compl., ECF No. 1. Grand's claim for relief, like its certified claim, includes four counts: changes, suspensions of work, differing site conditions, and breaches of the implied duty of good faith and fair dealing. *Id.* at 25–30. Grand seeks to recover $6,847,590.59 based on the damages calculation in its Change Proposal.[3] *Id.* at 25; *see* App. 138.

Following fact and expert discovery, the Government filed a Motion for Partial Summary Judgment on October 23, 2024. *See* ECF No. 28. It amended the Motion with an updated appendix and updated citations to that appendix on October 25, 2024. *See* ECF Nos. 30, 30-1. The Government requests summary judgment on Grand's claims related to the elevator extension work; any work covered under Modifications P00002, P00003, P00005, and P00006; direct

[3] Although there was considerable dispute in the briefing about Grand's damages calculation, Grand clarified at oral argument that its damages calculation in this case is, in fact, its Change Proposal attached to the REA. *See* Oral Arg. Tr. at 60:7–19, ECF No. 44. The Court notes two discrepancies, however. First, Grand's Complaint requests damages in the amount of $6,847,590.59, whereas the amount listed in the Change Proposal is $6,827,242.09. Second, the amount Grand requested in its certified claim to the VA, $6,763,423.55, differs from the amounts Grand requested in the Complaint and the Change Proposal. It is unclear what accounts for these differences. In any event, the Court will treat the Change Proposal as the operative damages calculation.

subcontractor costs; financing, interest, and fees; profit; overhead costs; and certain Materials costs and Equipment costs.[4] *See* ECF No. 30-1 at 2–3. The Motion was fully briefed on January 24, 2025. *See* Pl.'s Resp., ECF No. 35; Def.'s Reply, ECF No. 40. The Court held oral argument on June 12, 2025, and the Motion is now ripe for decision.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Rules of the United States Court of Federal Claims ("RCFC"). A fact is material when it "might affect the outcome of the suit," and a dispute is genuine when a finder of fact may reasonably resolve factual issues in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).

The moving party bears the burden of proving the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). It also "may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994); *see Celotex*, 477 U.S. at 322 (holding that summary judgment against a party is appropriate where it "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). If the moving party meets its initial burden, the burden shifts to the nonmoving party to set out specific facts showing a genuine issue for trial.

[4] During briefing and at oral argument, the parties made several changes to their positions. In its response brief, Grand withdrew its claim for lost profits. *See* Pl.'s Resp. at 40, ECF No. 35. At oral argument, Grand also withdrew its claim seeking unabsorbed office overhead, including expenses arising from its home office. *See* ECF No. 44 at 94:14–16. Also at oral argument, the Government withdrew its argument regarding concurrent delay, *see id.* at 4:18–19, and further conceded that bond insurance and contract administration costs were not appropriate for resolution on summary judgment, *see id.* at 28:1–6.

*See Anderson*, 477 U.S. at 250. The nonmoving party must do more than simply rely on the pleadings or make "conclusory allegations [in] an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

"When deciding a summary judgment motion, all of the nonmovant's evidence is to be credited, and all justifiable inferences drawn in the nonmovant's favor." *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 671 (Fed. Cir. 2000) (citing *Anderson*, 477 U.S. at 255); *see Dairyland Power*, 16 F.3d at 1202. The Court need not limit its review to materials only cited by the moving party when considering a summary judgment motion. *See* RCFC 56(c)(3). The Court "has discretion to consider other materials in the record when making its determination." 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2721 (4th ed.).

## III. DISCUSSION

The Government has demonstrated that Grand is not entitled as a matter of law to recover damages for the elevator extension work and any work covered under Modifications P00002, P00003, P00005, and P00006. However, Grand has provided sufficient argument and evidence to defeat the Government's request for summary judgment on direct subcontractor costs; financing, interest, and fees; profit; overhead costs; and certain Materials costs and Equipment costs.

### A. The Scope of Elevator Work Is a Patent Ambiguity in the Contract and Thus Grand May Not Recover Damages Related to the Extension of Elevator Service.

The parties dispute whether the contract required Grand to extend elevator service to the new top floor of the garage that Grand contracted to construct. Grand argues that the extension of elevator service was not a contract requirement because the terms of the Solicitation, which became the awarded contract, contained no drawing or specification associated with elevator work. *See* ECF No. 35 at 12–21. The Government, on the other hand, takes the position that CLIN 0001, as well as references in certain drawings in the contract, expressly required Grand to complete the

elevator work or, alternatively, that it was at least a patent ambiguity. *See* ECF No. 30-1 at 14–19. The Court agrees with the Government's alternative argument that the contract is patently ambiguous as to the scope of Grand's responsibility for elevator-extension work.

"Whether a contract provision is ambiguous is [] a question of law." *Premier Office Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011 (Fed. Cir. 2019) (internal quotations and citations omitted). A patent ambiguity is "an obvious omission, inconsistency, or discrepancy in significance." *Beacon Constr. Co. of Mass. v. United States*, 314 F.2d 501, 504 (1963). "If a contract contains a patent ambiguity, the contractor is under a duty to inquire and must seek clarification of the proper contract interpretation." *Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579–80 (Fed. Cir. 1993). The primary policy underlying the patent ambiguity doctrine is the need in government contracting to "avoid[] costly litigation after the fact." *Id.* at 1580 (holding that contractor "acted at its own risk when it proceeded to perform on the contract" without clarifying a patent ambiguity). Only "glaring," "substantial," or "obvious" ambiguities trigger the doctrine. *Id.* at 1579 (citing *Mountain Home Contractors v. United States,* 425 F.2d 1260, 1264 (Ct. Cl. 1970)). In contrast, a latent ambiguity is not facially obvious and does not raise a duty to inquire. *Eagle Hill Consulting, LLC v. United States*, 171 Fed. Cl. 115, 136 (2024). If a contractor shows that the ambiguity was latent, the contractor's interpretation will be adopted only if it is reasonable. *Cmty. Heating & Plumbing*, 987 F.2d at 1579 n.6 (citing *Froeschle Sons, Inc. v. United States,* 891 F.2d 270, 272 (Fed. Cir. 1989)). As with all questions of contract interpretation, the Court starts with the language of the contract itself. *See Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993).

Certain parts of the contract and project drawings provided that extension of the elevator service was within the scope of work that Grand was responsible for delivering. Most notably,

CLIN 0001 expressly stated that "[w]ork will include . . . *extensions and alterations to* utility systems, *elevators*, stairwells, [and] rooftop equipment." App. 6 (emphases added). Additionally, Drawing AS402 included the following direction: "EXISTING ELEVATOR SHAFT TO REMAIN - SAME SERVICE AND FUNCTION. *EXTEND SERVICE TO LEVEL 1*." App. 179 (emphasis added). This language specifically directed Grand to "extend" the elevator service to the new top floor, which is Level 1. The same drawing depicting the elevators included the following instruction: "DEMO WALL FOR NEW ELEVATOR DOORS." *Id.* Similarly, the structural notes contained in Drawing SI002 stated that the contractor should coordinate work related to the elevator extension with the elevator supplier:

> CONTRACTOR SHALL *COORDINATE* ELEVATOR PITS, SHAFTS, SLAB OPENINGS, FRAMING LOCATIONS, GUIDE RAIL SUPPORTS, DIVIDER BEAMS, HOIST BEAMS AND SUMP PITS *WITH ELEVATOR SUPPLIER* PRIOR TO CONSTRUCTION AS REQUIRED FOR PROPER INSTALLATION AND OPERATION. *COORDINATE* ANY REQUIRED STRUCTURAL MODIFICATIONS WITH THE STRUCTURAL ENGINEER PRIOR TO FABRICATION AND/OR INSTALLATION OF ANY STRUCTURAL ELEMENTS.

App. 181 (emphases added). This is further shown in Drawing GI101, which included the following construction note: "PROVIDE HOISTWAY BEAM AND REINFORCING AT TOP OF ELEVATOR SHAFT IF REQUIRED FOR INSTALLATION," further indicating that Grand had a direct responsibility for carrying out the elevator extension. App. 608.

Other aspects of the contract and project drawings, however, muddy the waters. Most notably, although several drawings mentioned the elevator, it is undisputed that there were no specific drawings or specifications in the contract as to the elevator extension work. *See* App. 783 (Paul Dep. Tr. at 83:22–84:20), 797–98. The drawings that did refer to the elevator either concerned other construction work—like Drawing AS402, which was entitled "STAIR 2 ENLARGED PLANS AND SECTIONS," App. 178—or merely contained structural or general

notes, *see* App. 608. Moreover, the drawings contemplated that the elevator extension could not be completed without the elevator supplier, which in this case was Thyssenkrupp. Drawing SI002's directive to the contractor to "coordinate . . . with [the] elevator supplier . . . as required for proper installation and operation," App. 181, did not indicate which party (the VA or Grand) was responsible for contracting with Thyssenkrupp for the elevator installation and whether those costs should be included in Grand's proposed contract price.

As discussed below, coordinating with the elevator supplier could reasonably be interpreted as a requirement falling under Grand's responsibility for delivering the elevator extension. After all, under "General Requirements," the contract specified that "THE CONTRACTOR SHALL PROVIDE ALL MATERIALS, EQUIPMENT, LABOR, AND SERVICES NECESSARY TO COMPLETE THE WORK." App. 608. It is also plausible, however, that Grand's coordination role, as described in this contract specification, could be interpreted as being limited to working with or overseeing Thyssenkrupp's work, including ensuring that the structural engineer approved any structural modifications prior to the elevator supplier fabricating and installing the elevators, but perhaps not as contracting with and paying for Thyssenkrupp's work. The vagueness of the term "coordinate" in this context—especially considered in conjunction with CLIN 0001 indicating that Grand itself was responsible for elevator work—should have rung alarm bells for Grand to inquire about the scope of its responsibility for such work.

At oral argument, Grand urged the Court to interpret the word "coordinate" as absolving Grand of responsibility for costs associated with elevator work.[5] Oral Arg. Tr. at 74:6–8, ECF No.

---

[5] Merriam-Webster defines the verb "coordinate" as "to bring into a common action, movement, or condition," supplying the example of "coordinate schedules" or "coordinating the

44 (arguing that "coordinate, in general terms and in construction, means cooperate with somebody who's not part of your contractual [or] sub-contractual chain"). The problem with this argument is that it essentially proves the Government's point: that the word "coordinate" had two plausible interpretations such that there was an ambiguity. Ambiguous contract provisions are those that are capable of more than one reasonable interpretation. *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434–35 (Fed. Cir. 1996). As with almost any major construction project, Grand, as the prime contractor, was expected to work with subcontractors and other parties to complete the work. Thus, "coordinate" appeared in several other parts of the project drawings. For instance, the drawings directed the contractor to "*COORDINATE* THE LOCATIONS OF ALL EQUIPMENT WITH RESPECT TO THE ARCHITECTURAL AND STRUCTURAL DETAILING OF SHAFTS, CHASES, AND SUCH," App. 608 (emphasis added); "*COORDINATE* FINISH PAINTING REQUIREMENTS WITH THE ARCHITECT," App. 630 (emphasis added); and *"COORDINATE* FRAMED OPENING SIZES AND LOCATIONS WITH THE MECHANICAL AND PLUMBING CONTRACTORS, *id.* (emphasis added). In each instance, "coordinate" reasonably could indicate that Grand needed to harmonize its efforts with those of the subcontractors or other parties on the Project to ensure that Grand could deliver the complete scope of work under the contract.

In short, the exact nature of Grand's responsibility for extending the elevator was ambiguous. The question then is whether the ambiguity was patent. Contrary to Grand's argument, the inconsistencies in the contract and project drawings were obvious. On the one hand, CLIN 0001 expressly included the extension of the elevator in Grand's scope of work and provided

---

relief effort." *Coordinate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/coordinate.

project drawings, one of which directed Grand to extend the elevator to the new level being constructed. On the other hand, the contract included no specific elevator drawings or specifications and vaguely instructed Grand to coordinate with the elevator supplier regarding elevator-related construction prior to installation. The inconsistency in the contract documents is both glaring and substantial. *See Beacon*, 314 F.2d at 504.

And it cannot be said that the need for extended elevator service was unknowable. Logically, the addition of a level to a VA hospital parking garage would necessarily require the extension of the existing elevator service so that hospital patients, some likely with mobility constraints, could feasibly access the hospital from the new level. Grand admits that it sent two representatives to attend the VA-hosted site visit before bidding on the project. *See* App. 221 (Grandstaff Dep. Tr. at 39:15–19). Thus, the Court can reasonably infer that Grand's representatives observed the existence of the elevator tower at the time of bidding. Moreover, the existing elevator structure was documented in the contract drawings and specifications, as pictured below.



EXISTING ELEVATOR TOWER

App. 707 (caption in original); *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1346 (Fed. Cir.

1998) (citing *Hardwick Bros. Co., II v. United States*, 36 Fed. Cl. 347, 406 (1996) ("It is well settled that a contractor is charged with knowledge of the conditions that a pre-bid site visit would have revealed."), *aff'd*, 168 F.3d 1322 (Fed. Cir. 1998)). After walking the site, a reasonable contractor bidding on the project would have inquired about the contractor's scope of work regarding elevators, given that the contract addressed elevator extension work but did not contain specific elevator drawings or specifications. Indeed, the VA's COR, Mr. Jimenez, testified at deposition that one or two questions about the extension of the elevator were asked at the site visit, although there is no evidence Grand's representatives asked these questions. App. 440 (Jimenez Dep. Tr. at 57:3–20); *see, e.g.*, *Vista Scientific Corp. v. United States*, 808 F.2d 50, 52 (Fed. Cir. 1986) (noting that the fact that a contractor actually inquired about an ambiguity can demonstrate that there was a patent ambiguity). Although Plaintiff generally challenges the reliability of Mr. Jimenez's recollection, it acknowledges that the cited testimony establishes that at least one contractor asked questions about the elevator during the site visit. *See* ECF No. 35 at 20–21.

Accordingly, there was nothing hidden about the ambiguity, either in the four corners of the contract or in the facts on the ground. *See Eagle Hill Consulting*, 171 Fed. Cl. at 136 (describing a latent ambiguity as being "hidden or concealed, not apparent on the face of the document" (citing *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1312 (Fed. Cir. 2016))). "[P]atent ambiguities are resolved against the contractor." *Baldi Bros, Inc. v. United States*, 156 Fed. Cl. 372, 382 (2021) (citing *Triax Pac., Inc. v. West*, 130 F.3d 1469, 1474–75 (Fed. Cir. 1997)). As such, Grand is not entitled to damages for work related to extending the elevator service.

Grand offers almost no legal argument as to why the ambiguity was hidden. Rather, its main contention in opposition to summary judgment is that the contract did not require elevator work at all because there was no elevator drawing or specification in the contract. *See* ECF No.

35 at 12; *id.* at 16–17 (arguing that without specifics about the elevator work no elevator work was required). Grand cites no case or regulation that requires every element of a construction contract to have an associated drawing[6] or that ascribes a contract requirement solely on the existence of an associated drawing. As a practical matter, at the time of bidding the elevator shaft was already fully constructed and elevator service was already operational to the existing parking garage floors. Thyssenkrupp, not Grand, would be responsible for installing the elevator for extended service, and it was Thyssenkrupp, not the VA, who ultimately provided the statement of work detailing the effort for the extension work. *See* App. 394 (Grandstaff Dep. Tr. at 212:9–15), 396–97 (Grandstaff Dep. Tr. at 214:20–215:2). The argument also completely ignores that CLIN 0001 expressly included "extensions and alterations to . . . elevators" in Grand's scope of work. App. 6. The lack of an elevator drawing does not negate this express contract provision. To the contrary, as discussed above, the lack of such a drawing further underscores the contract's patent ambiguity. If CLIN 0001 and other parts of the contract specifically required elevator-extension work, but there was no specific elevator drawing, then there was clearly an inconsistency about which Grand

[6] The Government argues that the VA was not required to include elevator drawings in the contract because VAAR 852.236-91(d), which was incorporated into the contract, indicates that drawings or specifications are not required where it is "impracticable to detail all items in specifications or on drawings because of variances in manufacturers' methods of achieving specified results." VAAR 852.236-91(d) (2002). Grand counters that the Government does not identify why elevator specifications would have been "impracticable" to include, particularly where there were numerous drawings of the other work required by the contract, including the extension of the staircase. ECF No. 35 at 17. Although the parties treat the issue as solely a legal question, determining whether it was "impracticable" for VA to provide a drawing—and thus whether VAAR 852.236-91(d) applies—appears to involve genuine disputes of material fact and is thus inappropriate for summary judgment. *See* AR 815–19 (meeting minutes detailing conflicting positions of the parties and third parties on whether the Solicitation could include Thyssenkrupp's specifications and scope of work). In any event, even if the Court found that this regulation applied, such a finding would not alter the Court's conclusion that the contract was obviously ambiguous as to the scope of elevator work.

should have inquired.[7] These obvious inconsistencies in the elevator requirement make the ambiguity patent. *Bayou Land & Marine Contractors, Inc. v. United States*, 23 Cl. Ct. 764, 773 (1991).

**B. Bilateral Contract Modifications Bar Grand from Recovering Damages for Changes 1, 3, and 6.**

The Government argues that Grand's claims for Changes 1 (Column Bump Out), 3 (Ramp Connection), and 6 (Footings) are barred by bilateral contract modifications, specifically Modifications P00002, P00003, P00005, and P00006. *See* ECF No. 30-1 at 19–24. Modifications P00003, P00005, and P00006 contained identical release language, while Modification P00002 contained different release language. According to the Government, the release language precludes further relief beyond what was provided for in the modifications themselves. *See id.* at 19. The Court agrees and finds that Grand's substantive and procedural counter-arguments (ECF No. 35 at 22–29) are unpersuasive.

To determine if a modification constitutes a release, the Court looks first at the plain language. Restatement (Second) of Contracts § 284 cmt. c (1981) ("The rules of interpretation that apply to contracts generally apply also to writings that purport to be releases."); *McAbee Constr.*, 97 F.3d at 1434. "[I]f the 'provisions are clear and unambiguous, they must be given their plain and ordinary meaning.'" *McAbee Constr.*, 97 F.3d at 1435 (quoting *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993)).

[7] Grand argues that because the VA's Architect of Record, Stacey Paul, could not identify what specific elevator work was required by the contract, there could not have been an elevator work requirement. *See* ECF No. 35 at 14. However, Ms. Paul's deposition testimony actually supports the conclusion that the contract was ambiguous. *See, e.g.*, App. 783 (Paul Dep. Tr. at 82:23–83:3) (Question: "What – in your opinion, what work is required when [the drawing] says extend service to level 1?" Answer: "I – I think that's – I couldn't tell you all the ins and outs of what is needed to extend the service, but, obviously anything that's necessary to get the elevator to level 1."). If the "ins and outs" of the elevator work were unclear from the contract, Grand should have inquired to gain clarity.

Here, the plain language of Modification P00006 stated that the purpose of the modification was to incorporate Change Order Request 56 for "column bump out repairs" pursuant to the Changes clause in FAR 52.243-4. App. 95. The modification extended the contract by 90 calendar days and increased the total contract value by $308,979. *Id.* The modification further stated:

> This change represents *full and complete compensation* due to the Contractor for *all costs*, direct and indirect, and *all time* associated with this change performed herein, including but not limited to, *all costs incurred* for extended overhead, disruption or suspension of work, field supervision, labor inefficiencies and this change's impact on unchanged work. All other terms and conditions remain unchanged.

*Id.*[8] (emphases added). Although Grand is correct that the above language did not include the word "release," ECF No. 35 at 25, it cites no case, and the Court is not aware of one, holding that a release of liability is effective only if it contains the word "release." Rather, a release is "a contract whereby a party abandons a claim or relinquishes a right that could be asserted against another." *Holland v. United States*, 621 F.3d 1366, 1377 (Fed. Cir. 2010). In sum and substance, Modification P00006 released the Government from further liability for both direct and delay costs related to Change Order Request 56. Specifically, the phrase "full and complete compensation" indicates that by accepting the increase in contract value, Grand relinquished its right to assert further damages against the Government for "all costs" (both direct or indirect) and "all time associated" with the work covered under the modification.[9] *See BES Design/Build LLC v. United States*, No. 19-1893, 2024 WL 304335, at *7 (Fed. Cl. Jan. 26, 2024) (finding that "full and complete compensation" constituted release language that would "bar[] Plaintiff's claims if

---

[8] Because Modifications P00003 and P00005 contained identical language, the Court will not discuss them separately. *See* App. 89 (Modification P00003), 92 (Modification P00005).

[9] This includes delay costs, contrary to Grand's argument. *See* ECF No. 35 at 27. The release language covers "*all costs* incurred for . . . disruption or suspension of work . . . and this change's impact on unchanged work." App. 95 (emphasis added).

enforced as written," even though the word "release" did not appear in the modification). This included—but was not limited to—"all costs incurred with extended overhead, disruption and suspension of work, field supervision, labor inefficiencies and this change's impact on unchanged work." App. 95. Thus, the plain language of Modification P00006 supports the Government's argument that it was a release.

Grand's contention that Modification P00006 "at best" supports an accord and satisfaction, not a release, is not a basis to deny summary judgment. ECF No. 35 at 25. An accord and satisfaction, as the term suggests, has two main elements: an accord, or agreement, and the performance of such agreement. *McLain Plumbing & Elec. Serv. v. United States*, 30 Fed. Cl. 70, 78–79 (1993); *see Brock & Blevins Co. v. United States*, 343 F.2d 951, 955 (Ct. Cl. 1965) (holding that, like any contract, an accord and satisfaction must have: "(1) proper subject matter, (2) competent parties, (3) a meeting of the minds, and (4) consideration"). As a bilateral contract modification, Modification P00006 could be characterized as an accord and satisfaction. *See, e.g.*, *Larry D. Barnes, Inc. v. United States*, 45 F. App'x 907, 911 (Fed. Cir. 2002) (contract modifications constituted an "accord and satisfaction" of the contractor's entitlements arising out of the work included in the modification). It modified the parties' contract by agreement to include additional work associated with Change Order Request 56, specified additional consideration for that additional work, and discharged the Government from any further costs related to that work. *See* App. 95. But even accepting Grand's argument, the Government still prevails because the characterization of the bilateral agreement language is not dispositive. That is, whether it was a release or an accord and satisfaction, the Government's obligation for any additional compensation was still discharged. *See, e.g.*, *McLain Plumbing*, 30 Fed. Cl. at 78 ("[D]ischarge by contract modification occurs either by accord and satisfaction or by release."); *Axion Corp. v. United States*,

68 Fed. Cl. 468, 479 (2005) (denying summary judgment on a separate issue but explaining that a "release and accord and satisfaction" clause in three contract amendments signed by the parties prior to termination of the contract would bar the contractor's claims). Thus, Grand's effort to convince the Court that Modification P00006 was not a release but rather an accord and satisfaction, without stating why the distinction matters to the outcome, does not help its case.

Grand appears to concede that the language in Modification P00002, unlike the language in Modifications P00003, P00005, and P00006, is a valid release. *See* ECF No. 35 at 27 (raising procedural, but not substantive, challenges to the Government's request for summary judgment on Modification P00002); *id.* at 25 (comparing language from Modification P00002 with language from Modification P00006). Modification P00002 incorporated the "Scope of Work for the 'Column Extensions and Cable Barrier.'" App. 87. It increased the contract amount by $11,229.37 and included the following language:

> E. This modification represents a complete equitable adjustment for all costs, direct and indirect, associated with the work and time agreed to herein, including but not limited to all costs overhead, supervision, disruption or suspension of work, labor inefficiencies, and this change's impact on unchanged work. The contractor unconditionally and specifically releases the Government from any and all delays, suspensions, and/or disruptions of work, and labor inefficiencies that may have occurred under this contract prior to the effective date of this modification.
> F. All other terms and conditions remain unchanged.

*Id.* This modification contains stronger release language than that of the other three modifications at issue in that it expressly stated that Grand released the Government from liability. *Compare id.* ("unconditionally and specifically releases" (Modification P00002)), *with* App. 95 ("full and complete compensation" (Modification P00006)). Regardless, each modification at issue contained the parties' agreement that the modification represented "complete" compensation and, when read in full, each modification described a full release of the Government's liability. *Cf. Bell BCI Co. v. United States*, 570 F.3d 1337, 1341 (Fed. Cir. 2009) ("The language plainly states that

Bell released the government from *any and all* liability for equitable adjustments attributable to Mod[ification] 93.").[10]

Attempting to defeat summary judgment on Modification P00002, and the other three modifications to the extent the Court finds they contain release language (which it does), Grand asserts several procedural challenges. First, it argues that the Government did not sufficiently plead or identify release as an affirmative defense in its Answer, so it should be barred from asserting the defense now. ECF No. 35 at 22–24. Grand points out that the Government's Answer raised the defense of accord and satisfaction, specifically mentioning Modifications P00003, P00005, P00006, and P00007. *Id.* at 22. While Grand acknowledges that the Answer asserted "waiver and release," *id.*, it claims the Answer did not specifically relate those defenses to the modifications and as such "[t]he Government does not plead that any claim or damage is released by any Modification," *id.* at 23. This is simply not correct. The excerpt of the Government's Answer that Grand includes in its brief omits the Government's third affirmative defense, which states: "The Government asserts that plaintiff has been paid for all of the work it performed at the contractually-agreed upon rates and thus has no claim for damages. Additional modifications or information may support the affirmative defenses of accord and satisfaction or release and waiver." ECF No. 7 at 26. The Government's third affirmative defense, although broad, ties the defense of release to the bilateral contract modifications.[11]

[10] The release language in *Bell BCI* was as follows: "This modification provides full compensation for the changed work, including both Contract cost and Contract time. The Contractor hereby releases the Government from any and all liability under the Contract for further equitable adjustment attributable to the Modification." 570 F.3d at 1341.

[11] The Court notes that the Government did not identify Modification P00002 in its affirmative defenses, but moves for summary judgment on the release language in that modification. Though Grand does not assert that this omission is prejudicial, it could plausibly be grounds for waiver. However, the Government stated in its Answer that the list of modifications

RCFC 8 states that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . release." RCFC 8(c).[12] "The purpose of Rule 8(c) of the Federal Rules of Civil Procedure is to give the opposing party notice of the affirmative defense and a chance to respond." *Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 411 F.3d 1369, 1376 (Fed. Cir. 2005).[13] "[T]he critical question . . . is whether requiring the defendant to plead the matter is necessary 'to avoid surprise and undue prejudice by providing the plaintiff with notice and the opportunity to demonstrate why the affirmative defense should not succeed.'" *In re ZAGG Inc. S'holder Derivative Action*, 826 F.3d 1222, 1231 (10th Cir. 2016) (quoting *In re Sterten*, 546 F.3d 278, 285 (3d Cir. 2008)).

The Court finds that, although the Government's Answer could have been more specific in tying release to the specific modifications it relies on in its summary judgment motion, the Government sufficiently pled the defense. Grand had an opportunity to conduct discovery on and respond to the Government's affirmative defenses, *see* App. 840 (identifying Modifications P00003, P00005, P00006, and P00007 in response to Plaintiff's interrogatory seeking information on affirmative defenses), and Grand has neither demonstrated nor argued that it was prejudiced by the Government's allegedly late argument about the release language in various modifications.

---

was not exhaustive. ECF No. 7 at 25 (asserting accord and satisfaction defense "based on all the modifications entered between the parties *including but not limited to* [Modifications 3, 5, 6, and 7]") (emphasis added)). Furthermore, the Government's broad language in its third affirmative defense left the door open for modifications not explicitly mentioned in its Answer. *Id.* at 26 ("Additional modifications or information may support . . . release.").

[12] Grand cites RCFC 9(c) for this proposition, but the Court presumes this was in error, because it is RCFC 8(c) that addresses affirmative defenses.

[13] Decisions interpreting Federal Rule of Civil Procedure ("FRCP") 8(c) are instructive because FRCP 8(c) is identical to RCFC 8(c) in all respects relevant to this matter. *See Abou-el-Seoud v. United States*, 136 Fed. Cl. 537, 557 n.21 (2018).

Because the Government raised the defense of release in its Answer, and because "the determinative factor is whether there is unfair surprise or prejudice," *Abou-el-Seoud*, 136 Fed. Cl. at 557, the Court finds that the Government's release arguments are not waived.

Second, Grand argues that the Government made a fatal mistake in failing to attach Change Order Request 56, referenced in Modification P00006, to its Motion. *See* ECF No. 35 at 25–26. In Grand's view, this absence of evidence means that the Government "has not satisfied its burden to prove the lack of a genuine issue of material fact." *Id.* at 26. The Government responds that the change order is in its appendix, though not attached to its Motion. *See* ECF No. 40 at 19. The Court is aware of no rule that would require the Government to attach the change order directly to its Motion if the document is contained in an appendix contemporaneously submitted in support of the Motion. Grand's argument is without merit.

In sum, bilateral contract modifications (specifically, Modifications P00002, P00003, P00005, and P00006) bar Grand from further recovery of damages for Changes 1, 3, and 6. The modifications released the Government from liability related to costs, including delay costs, associated with Changes 1, 3, and 6.

### C. Grand Is Not Legally Barred from Recovering Direct Subcontractor Costs.

Grand seeks $484,596 in direct subcontractor costs.[14] *See* App. 138. The Government argues that as a matter of law Grand is not entitled to recover these costs because (1) they are barred from recovery by VAAR 852.236-88(a)(1), which is incorporated into the contract, and (2) they lack adequate substantiation. *See* ECF No. 30-1 at 38–39. The Court agrees with Grand that

[14] The Court highlights that any subcontractor costs attributable to the elevator work (Thyssenkrupp) and any work covered by Modifications P00002, P00003, P00005, and P00006 (which includes work completed by a range of subcontractors) are unrecoverable by Grand. This section addresses the remaining subcontractor costs that are outside of those categories.

the cited regulation does not bar Grand's claim and is inapplicable, and it further finds that Grand's substantiation of direct subcontractor costs is sufficient to survive summary judgment.

Beginning with the Government's regulatory argument, VAAR 852.236-88(a)(1), which is entitled "Contract Changes—Supplement," applies to "proposed contract changes costing over $500,000." App. 25. Under this provision, "[t]he contractor must obtain and furnish with a [change] proposal an itemized breakdown . . . signed by each subcontractor participating in the change regardless of tier." VAAR 852.236-88(a)(1) (2002). The Government argues that Grand cannot recover direct subcontractor costs because, for purposes of the Change Proposal, its subcontractors did not sign an itemized breakdown of each of their costs. *See* ECF No. 30-1 at 38. Grand does not contest that it did not such documentation to support its Change Proposal, but disputes that this fact has any preclusive effect on the instant CDA claim. *See* ECF No. 35 at 42. The Court agrees.

Pursuant to the Tucker Act, this Court has "jurisdiction to render judgment upon any claim by . . . a contractor arising under [the CDA] . . . on which a decision of the contracting officer has been issued under section 6 of that Act." 28 U.S.C. § 1491(a)(2); *see* 41 U.S.C. § 7104(b)(1). A contractor submits a valid "claim" for purposes of the CDA when it submits a "written demand or written assertion . . . seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising from or relating to th[e] contract." FAR 2.101; *see* FAR 52.233-1(c); *M. Maropakis*, 609 F.3d at 1327. While there is no requirement that a claim "be submitted in any particular form or use any particular wording," it must provide "a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim," *Contr. Cleaning Maint.*, 811 F.2d at 592; request for a final decision; and, if the claim exceeds $100,000, include a certification executed by an authorized

individual on behalf of the contractor. *M. Maropakis*, 609 F.3d at 1328; *see* 41 U.S.C. § 7103(b). The CDA does not have a subcontractor certification requirement.

The Government responds that VAAR 852.236-88(a)(1) should apply to bar Grand's claim because the regulation is fully incorporated into the contract. ECF No. 30-1 at 38; *see* ECF No. 44 at 106:1–13 ("[T]he regulations that are appropriate for review to the contracting officer[] are the same regulations that the Court should review."). However, there is no dispute that Grand timely submitted its certified claim to the VA in accordance with the requirements of the CDA. Because Grand submitted a "valid claim" under the CDA and received the CO's final decision on that claim, there is no bar to it pursuing its claim in this Court. *See M. Maropakis*, 609 F.3d at 1327 (citing *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1541–42 (Fed. Cir. 1996)).

Moreover, even considering VAAR 852.236-88 in evaluating the merits of Grand's claim, the Government cannot prevail. This is because VAAR 852.236-88(a)(1) by its plain language applies only to "proposed change orders requested by the contracting officer." In other words, it defines requirements for a circumstance in which the VA intends to issue a formal change order, and as such the VA and the contractor must preemptively discuss the change and agree to an adjusted contract price.[15] The requirement that subcontractor signatures be obtained is specifically for a contractor's "proposal," requested by the VA, not for an after-the-fact request for equitable adjustment to the contract price, which is the case here.

In contrast to a change executed through a formal change order, a constructive change occurs when the Government orders—either impliedly or expressly—work that is beyond the

[15] Paragraph (a)(2) of the same regulation further supports this reading. It provides that "[w]hen the necessity to proceed with a change does not allow sufficient time to negotiate a modification or because of failure to reach an agreement, the contracting officer may issue a change order" based on "a tentative price," after which the contractor will provide a change proposal in accordance with paragraph (a)(1). VAAR 852.236-88(a)(2).

scope of the contract, and the contractor is seeking to recover damages for the increased costs resulting from that change subsequent to performance. *See BES Design/Build, LLC v. United States*, 175 Fed. Cl. 187, 196 (2025) (defining constructive changes as "any 'work performed outside of the scope of the contract'" (quoting *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 678 (1994))). Constructive changes, by their very nature, occur "without a formal order under the changes clause, either by an informal order of the Government or by fault of the Government." *Miller Elevator*, 30 Fed. Cl. at 678 (identifying five types of constructive changes, including "(I) disputes over contract interpretation during performance; (II) Government interference or failure to cooperate; (III) defective specifications; (IV) misrepresentation and nondisclosure of superior knowledge; and (V) acceleration"). "While the constructive change doctrine provides a means for a contractor recovery, the rationale for constructive changes involves the objective of persuading a contractor to continue to work pending resolution of any dispute involving the work at issue." *Id.*

Grand's direct subcontractor costs relate to work allegedly performed beyond the scope of the contract without a formal change order—in other words, they are constructive changes for which Grand now seeks additional recovery on its subcontractors' behalf. Thus, VAAR 852.236-88(a)(1) is inapplicable on its face. Tellingly, the Government cites no evidence showing that the VA itself found this provision applicable (or attempted to enforce it) at the administrative level when Grand submitted its REA with Change Proposal, and the CO's final decision makes no mention of any procedural defects in Grand's submission. Grand is therefore not required to have each of its subcontractors' signatures to show entitlement to an award of damages for subcontractor costs.

The Government makes two additional attempts at barring Grand's recovery of subcontractor costs. First, the Government argues that Grand's response to VAAR 825.236-88 ignores the *Severin* doctrine. *See* ECF No. 40 at 23–24. The *Severin* doctrine prevents a prime contractor from recovering damages from the Government on behalf of its subcontractor where the prime contractor has not reimbursed the subcontractor or is not liable to the subcontractor for those damages. *See J.L. Simmons Co. v. United States*, 304 F.2d 886, 888 (Ct. Cl. 1962); *Severin v. United States*, 99 Ct. Cl. 435, 443 (1943); 1 Bruner & O'Connor Construction Law § 4:48. For instance, if a subcontractor has contractually released the prime contractor from damages, the prime contractor cannot then recover those damages from the Government on the subcontractor's behalf. *Owens-Corning Fiberglas Corp. v. United States*, 419 F.2d 439, 455 (Ct. Cl. 1969). Despite acknowledging that the *Severin* doctrine "has been notably limited" with respect to equitable adjustment claims premised on the FAR's Changes and Differing Site Conditions clauses, ECF No. 40 at 23, the Government argues that VAAR 825.236-88(a)(1) "closes the hole in the Severin Doctrine," thus requiring a contractor to provide subcontractor certifications in order to prove it is liable to the subcontractor for the costs claimed. ECF No. 44 at 36:9–15.

As Grand correctly points out, the "certification process for direct change orders requested by a contracting officer has nothing to do with what *Severin* does and does not require." *Id.* at 88:15–17. The purpose of requiring an itemized and certified breakdown of costs as part of a contractor's change proposal is prospective and appears to directly relate to and support the parties' negotiations of a contract modification, helping the Government ensure that it pays a fair and reasonable price for the work required by a change order. The *Severin* doctrine, on the other hand, serves "to prevent assignment of claims against the government, to prohibit imposition of liability against the government without its consent, and to prevent actions against the government by those

lacking privity of contract with the government." *George Hyman Constr. Co. v. United States*, 30 Fed. Cl. 170, 178 (1993) (citing *Severin*, 99 Ct. Cl. at 444), *aff'd*, 39 F.3d 1197 (Fed. Cir. 1994). The invocation of the *Severin* doctrine does not support the Government's regulatory-bar argument.[16]

The Government's final argument regarding subcontractor costs is that Grand fails to substantiate such costs. For instance, the Government points out that the subcontractor cost attributable to Wadsworth Brothers is not substantiated. *See* ECF No. 30-1 at 39. In response, Grand cites generally to almost 200 pages of the record, claiming that a host of modification requests support its claim for Wadsworth Brothers' costs. *See* ECF No. 35 at 51 (citing App. 1191–1341). While the Court does not find this evidence clear enough to arrive at the damages amount that Grand seeks for Wadsworth Brothers' work, it is at least some evidence demonstrating Grand's alleged damages for this subcontractor cost. *See, e.g.*, App. 1291, 1295. Similarly, Grand's Response identifies proof of costs associated with CMT Engineering Laboratories. *See* ECF No. 35 at 50–51 (citing App. 1342–43). This evidence is likewise sufficient to preclude

[16] The only evidence of a release between Grand and one of its subcontractors that could potentially trigger the *Severin* doctrine is the settlement agreement between Grand and the subcontractor Rodac. *See* App. 599. The Government asserts that Grand has no legal entitlement to Rodac's costs because the settlement agreement included a release and was executed prior to Grand filing this lawsuit. *See* ECF No. 30-1 at 39. However, the language of the settlement agreement states that the release is "[e]ffective upon receipt from CONTRACTOR of the amount stated to be due in said Final Request for Payment," and it is not clear from the record what the "Final Request for Payment" is and whether Rodac received the amount due. App. 599. The record also seems to indicate that Grand did not view this agreement to constitute a complete release. *See* App. 423–24 (Grandstaff Tr. at 241:14–242:11) (suggesting that Rodac could recover additional funds from Grand if Grand prevails in this suit). It is the Government's burden to show that Grand is not liable to Rodac, and only an "iron-clad release [is] sufficient to trigger application of the *Severin* doctrine." *Metric Constructors, Inc. v. United States*, 314 F.3d 578, 584 (Fed. Cir. 2002). Because of the factual dispute around the effect of the Rodac settlement agreement, and because of the scant briefing on this issue, the Court finds that the Government has not met its burden at the summary judgment stage.

summary judgment on this subcontractor cost. Finally, although the Government identifies problems with Grand's substantiation of its subcontractor costs related to roofing, *see* ECF No. 40 at 24–25, Grand provides evidence for some of these costs through invoices from L&L Erection. *See* App. 1050–61. The Court takes the Government's point that these documents "address only a fraction of Grand's claimed $649,852 for the roof," ECF No. 40 at 24–25, but that is exactly the Court's point in denying summary judgment: that there is a genuine factual issue about the correct amount of subcontractor costs to which Grand may be entitled. The existence of a dispute between the parties as to the amount of recovery makes clear that the issue cannot be resolved at summary judgment. *See Edge Constr. Co. v. United States*, 95 Fed. Cl. 407, 417 (2010) (explaining that the plaintiff's claimed damages were a reasonable approximation of the actual cost of the government's constructive change, and that this substantiation was enough to survive summary judgment).

Thus, the Government's main arguments regarding direct subcontractor costs—VAAR as a regulatory bar and Grand's lack of substantiation—fail. As such, Grand's direct subcontractor costs survive summary judgment, except for those costs associated with work for which Grand is otherwise not entitled to relief.

### D. Grand Is Not Legally Barred from Recovering Damages for Financing, Interest, and Fees.

Grand seeks $1,037,500 in damages for "Fees and Interest paid on LOC [lines of credit] to Finance Project" and $277,939.32 for "Loans to Finance Project." App. 138. The Government argues that these are unallowable costs because they are barred by the FAR and, in any event, Grand has not adequately substantiated them. ECF No. 30-1 at 31. The Government further suggests that Grand is attempting to double-count claimed costs by seeking recovery for both the Project's costs and the loans used to finance those costs. *Id.* at 32. Grand concedes that it is not

entitled to recover any loan principal amounts that were used to cover direct and indirect costs that it is otherwise seeking as claimed damages. *See* ECF No. 35 at 39. The Court finds the Government's remaining arguments insufficient to bar Grand's recovery of financing, interest, and fees altogether.

Absent an explicit waiver, sovereign immunity generally shields the United States from interest damages according to what courts have called the "no-interest rule." *Sandstrom v. Principi*, 358 F.3d 1376, 1380 (Fed. Cir. 2004). The Federal Circuit (and its predecessor court) has held that a "Changes" clause in a contract expressly waives the Government's sovereign immunity such that it may be liable for costs related to financing, interest, and fees that a contractor incurs as a result of government-caused delays during performance. *See Bell v. United States*, 404 F.2d 975, 984 (Ct. Cl. 1968) (holding that interest was allowable for equitable adjustment claim under Changes clause); *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1582 (Fed. Cir. 1994) ("[A] contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract."); *see also Energy Nw. v. United States*, 641 F.3d 1300, 1312 (Fed. Cir. 2011) (holding that a Changes clause "amount[s] to a waiver of the "government's immunity against recovery of interest"). In *Bell*, the plaintiff-contractor, a parachute manufacturer, sought an equitable adjustment under the Changes clause of its contract with the Army to recover additional costs resulting from the Government's defective parachute design. 404 F.2d at 976–79. The Court reasoned that the Changes clause, which entitled the contractor to reimbursement of the "'increase * * * in the cost of performance'" resulting from contract changes, contemplated awarding interest costs. *Id.* at 984.

A government contract that includes a Changes clause, however, can nevertheless bar recovery of interest through inclusion of other contract provisions. In *Doyon Utilities, LLC v.*

*United States*, 148 Fed. Cl. 69, 81 (2020), the contract at issue included a Changes clause identical to the one in *Bell*. *Id.* But the court held that the plaintiff's "recovery of interest [was] explicitly barred by incorporation of [Defense Federal Acquisition Regulation Supplement] § 252.243-7001" into the contract. *Id.* That provision applies "contract cost principles and procedures in FAR part 31" "when costs are a factor in any price adjustment under th[e] contract." *Id.*; *see* 48 C.F.R. § 252.243-7001 (1991). FAR part 31, in turn, provides that "[i]nterest on borrowings (however represented), bond discounts, costs of financing and refinancing capital (net worth plus long-term liabilities), legal and professional fees paid in connection with preparing prospectuses, and costs of preparing and issuing stock rights are unallowable." FAR 31.205-20; *see Doyon Utilities*, 148 Fed. Cl. at 81 (quoting FAR 31.205-20). As the court explained, incorporation of a provision "effectively barring interest means that the changes clause does not apply and sovereign immunity is not waived." *Doyon Utilities*, 148 Fed. Cl. at 81.

Similarly, recovery of interest can be precluded under the FAR if cost principles apply to the contract. In *Va Venture Pueblo v. Principi*, 119 F. App'x 274, 276 (Fed. Cir. 2004), a case on which the Government relies, the Federal Circuit found that the VA Board of Contract Appeals correctly applied FAR 31.205-20 in holding that the plaintiff-contractor was not entitled to interest on borrowings it was required to pay as a result of the Government's 31-day delay. Although the board did not specifically cite a contract provision, it expressly found that FAR part 31 "applie[d] to the pricing of equitable adjustment under the Lease" between the parties. *In Re Va Venture Pueblo*, VABCA No. 6959, 04-1 B.C.A. (CCH) ¶ 32459 (Nov. 7, 2003).

A Changes clause itself can also bar recovery of interest on borrowed funds if it includes such language or incorporates regulatory provisions barring recovery. In *Servidone Construction Corp. v. United States*, 19 Cl. Ct. 346, 383 (1990), *aff'd* 931 F.2d 860 (Fed. Cir. 1991), the court

rejected the plaintiff-contractor's request for recovery of interest on borrowings it made to cover additional performance costs due to differing site conditions. In that case, the provision of the contract controlling the pricing of change orders incorporated section 15 of the Defense Acquisition Regulations ("DAR"), which, like the unallowable costs provision in *Doyon*, barred recovery of such interest. *Id.*; *see* 32 C.F.R. § 15.205-17 (1982) ("Interest on borrowed funds (however represented) is unallowable."). The DAR section 15 provision was a predecessor to FAR 31.205-20. *See* 64 Fed. Reg. 4760 (Jan. 29, 1999).

Here, it is undisputed that the contract between Grand and the VA incorporated the FAR's Changes clause, which is functionally equivalent to the Changes clause that was at issue in *Bell*. *See* App. 15 (listing FAR 52.243-4 under FAR clauses incorporated by reference). Unlike in *Doyon Utilities* and *Servidone*, the Government points to no contract language or other contract provision (including any reference to FAR 31.205-20) excepting recovery of loan interest from the Changes clause.

Although the Government contends that Grand's claim for loan interest is nonetheless precluded by FAR 31.205-20, unlike in *Va Venture Pueblo*, it has not demonstrated that cost principles apply to this fixed-price contract. FAR 31.102, Fixed-price contracts, states: "[t]he applicable subparts of part 31 shall be used in the pricing of fixed-price contracts, subcontracts, and modifications to contracts and subcontracts whenever (a) cost analysis is performed, or (b) a fixed-price contract clause requires the determination or negotiation of costs." The Government does not show that either scenario is present here. There is no evidence in the record that the VA performed a cost analysis for this contract, and the Government has not pointed to any contract clause that "requires the determination or negotiation of costs." Instead, the Government describes the inapplicability of cost principles as "questionable," ECF No. 40 at 27, citing that the contract's

inclusion of VAAR 852.236-88, which states that "[w]hen certified cost or pricing data are required under FAR 15.403, the cost or pricing data shall be submitted in accordance with FAR 15.403-5." *Id.* (quoting VAAR 852.236-88). As explained above, VAAR 852.236-88 is not facially applicable to Grand's claim. *See supra* § III.C. Rather, the only clause in the contract that expressly applies cost principles under FAR Part 31 is FAR 52.249-2, Termination for Convenience of the Government, which is incorporated by reference. *See* App. 15. FAR 52.249-2(i) states: "[t]he cost principles and procedures of part 31 of the [FAR], in effect on the date of this contract, shall govern all costs claimed, agreed to, or determined under this clause." However, the clause limits the application of FAR Part 31 to costs claimed "under this clause," and here, the Government did not terminate Grand's contract for convenience.[17] Thus, FAR 52.249-2 cannot form the basis for finding that cost principles applied to the fixed-price contract at issue.

In sum, because *Bell* governs here, interest is recoverable under the Changes clause. The Court therefore rejects the Government's argument that FAR 31.205-20 wholly bars Grand from recovering costs associated with financing, interest, and fees.

The Government also argues that even if Grand's claim is not barred by regulation, it has not adequately supported its claimed damages for financing, interest, and fees. *See* ECF No. 30-1 at 32. In particular, the Government takes issue with what it identifies as duplicative reimbursement. *See id.* While the Court agrees that Grand cannot recover damages for both the costs of the Project and for the principal amounts of loans it took out to finance the Project—because such recovery would be duplicative—the extent of that overlap is a factual issue that

[17] The Government's reliance on *ACLR, LLC v. United States*, 157 Fed. Cl. 324 (2021), *aff'd*, No. 2023-1190, 2024 WL 4315111 (Fed. Cir. Sept. 27, 2024), which involved a constructive termination for convenience under FAR 52.212-4(l), is therefore misplaced. *See* ECF No. 30-1 at 31.

cannot be resolved at summary judgment. Furthermore, while the Government is correct that Grand has failed to specify exactly what additional work was funded by these loans (and whether Grand may be barred from recovering as a matter of law the costs of some of that work altogether—for instance, any costs associated with the elevator work), *see id.*, that factual dispute is also inappropriate for summary judgment. As the Government's own expert acknowledges, Grand has provided evidence that it took out six different loans to finance the project. *See* App. 484. Grand asserts that the loans were incurred as a result of the Government-caused delays on the project, ECF No. 35 at 31–32, and as the Court has noted, concurrent delay is still a live factual issue in this case. Thus, the Court is unwilling to grant the Government's request to prevent Grand from pursuing these costs altogether.

Moreover, having reviewed the evidence presented, the Court cannot conclude, at the summary judgment stage, that Grand has wholly failed to support these damages. Nor has the Government "show[n] the court that there is an absence of evidence to support the nonmoving party's case." *Dairyland Power*, 16 F.3d at 1202 (citing *Celotex*, 477 U.S. at 325). The Court notes, however, that although Grand's evidentiary presentation passes muster to defeat the Government's Motion, Grand will need to demonstrate clearer evidence of the costs it incurred for financing, interest, and fees—including linking such costs to VA-caused delays—in order to prevail at trial.

### E. The Government Has Not Demonstrated that Grand's Overhead Costs Are Not Recoverable as a Matter of Law.

The Government asserts that Grand is not entitled to overhead costs because, in the Government's view, Grand's overhead costs are duplicative, unsubstantiated, and barred by regulation. *See* ECF 30-1 at 34. Grand seeks two main types of overhead: overhead that is listed in the Change Proposal category of "Other Direct Costs," which amounts to $1,206,321.17, *see*

App. 138, 141; and overhead that is calculated by applying 10 percent, 7.5 percent, and 5 percent incremental rates to both its Direct Costs, which results in overhead of $119,700.88, and to its External (meaning subcontractor) Costs, which total $27,278.78, *see* App. 138. Grand clarified in its Response and at oral argument that Grand is no longer seeking unabsorbed home office overhead, rendering the Government's duplicative-cost argument moot. *See* ECF No. 35 at 46; *see also* ECF No. 44 at 94:14–16.

The Government's principal challenge to the first category of overhead, "Other Direct Costs," is that Grand has not properly substantiated such costs.[18] *See* ECF No. 40 at 40–43. Grand's "Other Direct Costs" primarily consist of labor costs for Grand's managerial and supervisory staff. *See* App. 141. The Government argues that Grand should not be entitled to recover these costs because it has not sufficiently substantiated its labor rates and because the total overhead cost amounts are implausible. ECF No. 40 at 41. However, the discrepancies that the Government points out confirm rather than refute that there is a genuine dispute of material fact with regard to Other Direct Costs, especially because the total calculation is linked to Grand's claimed delay period which itself raises a factual dispute about concurrent delay.

Part of the Government's concern with Grand's labor costs calculation is that it does not establish the cost amounts associated with particular delays or additional work. *See* ECF 30-1 at 27–28 ("Grand has blanketly claimed roughly 681 days of wages for all legal theories—but has

[18] The Government's other lack-of-substantiation argument seems to apply only to Grand's claim for unabsorbed home office overhead. *See* ECF No. 30-1 at 37 (relying on the testimony of Grand's financial controller, Tiffany Wangsgaard, who admitted that Grand did not track overhead). As noted, Grand has since decided not to pursue home office overhead. *See* ECF No. 35 at 46 (clarifying that it "is not seeking unabsorbed home office overhead," but that it is seeking "extended job site overhead, which includes the burdened hourly rates of its supervisory personnel, including Mr. Grandstaff, office supplies, temporary toilets, insurance, bonding costs, and phones"). This section therefore addresses extended job site overhead, which comprises Grand's "Other Direct Costs" in its Change Proposal. App. 138.

provided no foundation for extracting the wages/damages that are associated with the column bump out change, versus other damages or suspension theories."). The Court agrees with the Government that it is difficult to decipher from Grand's calculations which labor costs match which additional work. For instance, for the claims that Grand is legally barred from pursuing (*e.g.*, work associated with the elevator and work associated with Changes 1, 3, and 6), the Court is not able to decipher from the present record the amount of associated labor costs that are likewise unrecoverable. The record before the Court is not clear enough to discern exactly how many days, and thus how much in labor costs, are due to each of Plaintiff's claims. Moreover, because the Government has withdrawn its concurrent delay arguments at summary judgment, the Court cannot make a finding at this stage as to how many days of compensable delay Grand is potentially entitled to absent a factual presentation at trial. Much of the Government's argument around labor costs focuses on the idea that Grand has not proven that the VA solely caused the project delays, and that without establishing causation, Grand cannot prove that its labor costs are recoverable. *See* ECF 30-1 at 29–30, 41. Now that concurrent delay is no longer at issue in the summary judgment motion, that argument must fail at this stage.

The Government's substantiation argument also fails because it applies the wrong standard at the summary judgment stage. Although Grand submitted certain payroll register documents for supervisory personnel, *see* App. 1076, 1146–47, 1150, 1024–26, the Government argues that summary judgment is warranted because Grand fails to substantiate the claimed hours worked through any timesheet or paystub records. *See id.* at 41. The Government relies upon *ACLR, LLC v. United States* to establish that Grand needs more support for its Other Direct Costs labor calculations, characterizing the decision as holding that "a contractor's claim for damages for personnel time lack[s] support where the contractor ha[s] not tracked labor hours in a record

keeping system." *See id.* at 30. That characterization is technically correct, but it does not support the Government's request for summary judgment in its favor. Indeed, the court in *ACLR* denied the *contractor's* motion for summary judgment on the basis that it had not tracked labor hours, which, according to the court, created a genuine issue of material fact. 157 Fed. Cl. at 334–36. Here, it is the Government moving for summary judgment, not Grand. Thus, *ACLR* actually supports Grand's position that any lack of substantiation of labor costs in the form of timesheets or paystub records creates rather than shows the absence of genuine factual disputes.

The Court appreciates the Government's arguments that Grand's labor costs may be inflated or not well-substantiated. Although Grand's evidentiary presentation is sufficient to survive summary judgment, it is weak in many areas, and the Court has legitimate concerns that Grand will be unable to produce evidence substantiating the full amount of claimed costs at trial. *See, e.g.*, ECF No. 40 at 29 (citing App. 449) (arguing that payroll register records show staff did not work 40 hours per week and were paid $31.25 and $24.04 per hour instead of $85.00 and $80.00 per hour as reflected in the Change Proposal). But such discrepancies do not entitle the Government to summary judgment, rather they show that there are material factual disputes as to the amount of overhead costs that Grand can prove. That is because, even at trial, Grand need not prove its damages with absolute certainty. *See Sys. Fuels, Inc. v. United States*, 666 F.3d 1306, 1311 (Fed. Cir. 2012) (explaining that "the amount of damages need not be 'ascertainable with absolute exactness or mathematical precision,' [but that] recovery for speculative damages is precluded" (alteration in original) (quoting *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005)). Once liability is established, a plaintiff may offer reasonable approximations of damages. *Wunderlich Contracting Co. v. United States*, 351 F.2d 956, 968 (Ct.

Cl. 1965) ("It is sufficient if he furnishes the court with a reasonable basis for computation, even though the result is only approximate.").

For instance, Grand contends that the wage rates used to calculate labor costs were industry-standard and factored in costs such as workers' compensation insurance and payroll taxes. App. 259 (Grandstaff Dep. Tr. at 77:5–21). The Government emphasizes that Grand cannot confirm that the wage rates precisely reflect Grands' actual costs for each employee, particularly because Grand failed to produce in discovery records from Grand's ComputerEase system, which likely would confirm the rates. *See* ECF No. 30-1 at 42–43. Although there is a dispute about the appropriate wage rates, the Government has not shown that Grand is completely barred from recovering any labor costs as overhead.[19] *See Entergy Nuclear Vermont Yankee, LLC v. United States*, 95 Fed. Cl. 160, 183 (2010) ("Reasonable certainty also is a question of fact."). Instead, factual presentation is necessary for the Court to determine whether Grand's calculation of labor costs is supportable, and the Government will then be able to challenge any inconsistencies. The Government's argument that Grand cannot recover any damages for overhead costs in the "Other Direct Costs" category therefore fails.[20]

The Government argues that the second category of overhead costs—those calculated using incremental rates of 10 percent, 7.5 percent, and 5 percent applied to both Grand's Direct Costs

[19] In fact, the Government admitted at oral argument that Grand has provided at least some evidence of labor costs, which would allow the Court to rule in Grand's favor. *See* ECF No. 44 at 54:8–10 ("Your Honor could—if the Court was so inclined, rule[] that Grand has met that scintilla of evidence by presenting $14,000 in payroll."). Grand has presented evidence through its payrolls. *See* App. 1076, 1146–47, 1150, 1024–26 (payrolls for supervisory personnel).

[20] The Government has not challenged Grand's calculation of the non-labor overhead costs in the "Other Direct Costs" category—temporary facilities, field support, temporary utilities, construction equipment, and special conditions items. App. 141. The Court finds that Grand has made a sufficient evidentiary showing of such costs to survive summary judgment. *See* App. 1022–24, 1029–33 (office supplies, phone, and sanitary).

and to its External (subcontractor) Costs—are not permitted by regulation. *See* ECF No. 30-1 at 35. VAAR 852.236-88(b)(4) allows contractors to recover overhead costs on changes not to exceed the incremental rates claimed by Grand. But, as the Government points out, the provision at issue pertains only to changes "costing $500,000 or less," VAAR 852.236-88(b), and Grand's claim is almost $7 million. *See* ECF No. 30-1 at 35.

The Court agrees that VAAR 852.236-88(b) is inapplicable by its own terms to this case, but that does not mean that Grand is precluded from recovering any damages for overhead. VAAR 852.236-88(a) applies to changes that cost over $500,000, as is the case here. Although that provision, unlike VAAR 852.236-88(b), makes no mention of overhead costs or rates, it does not follow that overhead is necessarily disallowed for changes to which subsection (a) applies. Imputing that conclusion into the regulation would create a regulatory bar where there is none. As Grand correctly states, Circuit precedent holds that where a constructive change has occurred, the contractor is permitted to recover "any increased costs flowing directly or necessarily from that change," which would include overhead costs. *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1348 (Fed. Cir. 2000) (citations omitted). That the VA has by supplemental regulation capped overhead rates for changes under a certain cost amount does not mean that it has barred recovery of overhead costs altogether for changes over that cost amount. Indeed, the silence of VAAR 852.236-88(a) more reasonably suggests the potential for negotiation as to what overhead rates should apply to changes subject to that provision.

The Government further argues that Grand has treated the incremental rates provided in subsection (b) as "default overhead rates . . . without supporting evidence" demonstrating that it incurred those rates, ECF No. 30-1 at 35, and that application of the rates to seek subcontractor overhead costs is both duplicative and unreasonable, ECF No. 40 at 25. Grand asserts that it should

be entitled to overhead rates of 10 percent because the VA approved these rates for Grand's previous change orders, which establishes a course of dealing between the parties. *See* ECF No. 35 at 48–49. The Court agrees that Grand must substantiate its request for both direct and subcontractor overhead costs; neither the case law discussing the standard of proof for damages nor the FAR or VAAR provide for default overhead rates. The Court likewise agrees that there is a dearth of evidence in the record supporting Grand's claim for such costs. At minimum, however, the evidence of historic rates paid by the VA creates a genuine dispute of material fact between the parties as to which rates should apply. Thus, the Government's argument that Grand cannot recover overhead on its direct costs and external costs also fails.[21]

### F. The Government Has Not Demonstrated that Grand Is Barred from Recovering Profit.

The Government makes a similar regulatory argument regarding Grand's entitlement to profit, which like overhead, Grand calculated in the Change Proposal using the incremental rates of 10 percent, 7 percent, and 5 percent applied to its Direct Costs (for a total of $114,000.84, *see* App. 138) and its External (subcontractor) Costs (for a total of $25,979, *see* App. 138). *See* ECF No. 30-1 at 37. The Government asserts that VAAR 852.236-88(b)(4) bars Grand from recovering this incremental profit because that regulation only applies to changes costing $500,000 or less. *See id.* at 30–31, 40. For the reasons explained in the preceding section addressing overhead costs, the Court also rejects the argument as to profit. Although the regulation does not *entitle* Grand to those profit rates, it does not prohibit Grand from recovering profit altogether.

[21] The Court notes, however, that Grand cannot be awarded "overhead on overhead." In the Change Proposal, Grand included "Other Direct Costs"—which is a category of overhead—as a line item within its Direct Costs and then it applied the incremental overhead rates to the total Direct Costs amount. *See* App. 138. Applying an overhead percentage rate to a figure that incorporates overhead costs is duplicative.

**G. The Government Has Demonstrated in Part that Summary Judgment Is Appropriate on Materials and Equipment Costs.**

Grand seeks $992,553.70 in Materials costs and $46,141.91 in Equipment costs. App. 138. The Government argues that Grand is not entitled to these costs for several reasons: they lack substantiation, are duplicative, and are unsupported by a valid concurrent delay analysis. *See* ECF No. 30-1 at 44–48. The Court finds that Grand's recovery of Materials costs related to lowering the roof and Equipment costs are not precluded as a matter of law. Accordingly, the weighing of such evidence establishing these damages will be reserved for trial. However, summary judgment is warranted on Materials costs related to elevator work and to delays caused by roof reconstruction work.

1. <u>Materials</u>

Grand's Materials costs derive from three items: "elevator and hoistway modification CO #32, 52"; "lowering of the roof, CO #33"; and "additional cost for roof due to six months of delays in reconstruction." App. 139. Although called "Materials" by Grand, they are essentially additional subcontractor costs and overhead costs. The Court first notes that Grand is barred from recovering any damages related to the elevator work because the elevator was a patent ambiguity in the contract, as discussed in Section III.A. Thus, the line item identifying Materials costs for elevator and hoistway modification cannot survive summary judgment.

That leaves the Court to consider the other two items. The Government asserts that "these damages lack substantiation and are duplicative with Grand's other claimed wage and subcontractor expenses." ECF No. 30-1 at 44. The Government points out that the "lowering the roof" calculation of $122,852 corresponds to the amount sought in Change Order Request 33 ($141,307), minus overhead, bond and insurance, and home office overhead. *Id.* (citing App. 539). The Court follows the Government's math. But beyond claiming that these costs are the same, the

Government makes no further argument about why Grand cannot show entitlement to the $122,852 associated with Change Order Request 33, when the Materials costs in its Change Proposal directly incorporates Change Order Request 33. Grand responds that this figure is supported by Change Order Request 33, which included itemized proposed costs for the subcontractors—*e.g.*, Recon, Intermountain, and Bragg Crain—who were engaged to work on lowering the roof. *See* ECF No. 35 at 45–46; *see also* App. 541. Grand also submitted evidence demonstrating the costs actually incurred for the work. *See* App. 1028, 1062, 1067–71, 1073–74. These costs do not exactly match the total amounts claimed in the Change Proposal, but they are sufficient to survive summary judgment. *See Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960) ("Difficulty of ascertainment is not to be confused with right of recovery.").

The Government replies that Grand fails to address the Government's duplication argument in its response brief, thus waiving the issue. *See* ECF No. 40 at 22. The Court agrees that part of the amount claimed as Materials costs related to "lowering the roof"—specifically, some of the Other Direct Costs charged in Change Order Request 33—appear to overlap with the Other Direct Costs claimed in the Change Proposal. *Compare* App. 540 (Change Order Request 33), *with* App. 141 (Change Proposal). Because the Change Proposal captures all Other Direct Costs pertaining to the entire alleged 681-day delay, it appears to encompass any corresponding costs related to the 20 days of delay purportedly caused by work related to lowering the roof. Grand cannot recover duplicative costs, but this fact does not preclude Grand from recovering any Materials costs. Moreover, related to this analysis is the issue of concurrent delay, which is no longer before the Court on summary judgment, so it is not possible to tease out the Other Direct Costs due to the roof-lowering claim as separate from the overall delay claim. The Government's duplication argument, therefore, involves genuine issues of material fact that should be resolved at trial.

Regarding the remaining line item for the Materials costs, "additional cost for roof due to six months of delays in reconstruction," the Government argues that the claimed $527,000 amount is unsupportable because Grand has not conducted a critical path analysis that would support the six-month delay and because it is similarly duplicative and unsubstantiated. *See* ECF No. 30-1 at 45–46. The Court does not find that the first argument warrants summary judgment, both because Grand has submitted expert reports addressing schedule delay, *see* ECF No. 35 at 31 (citing App. 876–905, 918–61), and because the Government's concurrent-delay argument is not before the Court on summary judgment. The Government's second and third arguments are more persuasive. Grand has submitted no evidence that substantiates the costs associated with this line item, let alone explains the cost elements. Unlike the two other categories of Materials costs, the roof delay is not associated with any particular change order request that the Court can cross-reference. *See* App. 139. Nor are there copies of invoices or internal ledgers that track costs because this line item does not pertain to subcontractors. App. 288 (Grandstaff Dep. Tr. at 106:10–16). Rather, Mr. Grandstaff, as Grand's Rule 30(b)(6) deponent, testified that this line item would include other direct costs—not Materials costs—*i.e.*, "project manager rate, project superintendent, safety, QAQC, and so forth, and those rates for that roughly 161 days," in addition to "additional facility costs, field supports costs, and then the equipment costs for the company vehicles." App. 287 (Grandstaff Dep. Tr. at 105:8–13), 289 (Grandstaff Dep. Tr. at 107:13–14). These costs were purportedly documented in a worksheet associated with a change proposal that was never submitted to VA. *Id.* (Grandstaff Dep. Tr. at 287:14–17). Grand does not dispute the Government's representation that no such document was produced during discovery, *see* ECF No. 30-1 at 46, and Grand did not submit a copy of the worksheet in response to the Government's Motion.

Indeed, Grand's Response does not address the Government's challenges to the sufficiency of the evidence demonstrating this category of Materials costs. It instead argues that this category "is associated with the Government-caused [600+] days of delay, due to unreasonably slow response times associated with additional critical path work, which included the re-installation of the existing roof and steel columns (CO 33) and the bump-out column structural fix (CO 56)." ECF No. 35 at 46. Notably, this statement contradicts the testimony of Mr. Grandstaff, who claimed that the Materials costs for the roof delay were separate from the alleged 681-day delay and thus were not reflected in the Change Proposal's Other Direct Costs worksheet. App. 291 (Grandstaff Dep. Tr. at 109:16–110:3). Grand went on in its brief to cite evidence generally supporting its Other Direct Costs worksheet. *See* ECF No. 35 at 46–47.

Assuming Grand's brief is correct, this category of Materials costs is part of the Other Direct Costs line of the Change Proposal and is thus duplicative. This conclusion would make sense because the category does not actually reflect costs of materials; it comprises overhead. Even if it is not duplicative, Grand has entirely failed to present any evidence showing the elements of this cost category—how it calculated the $527,000 figure—and evidence supporting the incurrence of those costs. The Government has met its burden of showing an absence of evidence to support Grand's claim. *Dairyland Power*, 16 F.3d at 1202 (citing *Celotex*, 477 U.S. at 325). Thus, the Government is entitled to judgment as a matter of law on the line item for "additional cost for roof due to six months of delays in reconstruction."

2. <u>Equipment</u>

The Government also seeks summary judgment on Grand's Equipment costs, which consist of $46,141.91 in field overhead associated with Grand's trucks. *See* ECF No. 30-1 at 46; *see also* App. 140. The Government's argument rests upon its concurrent-delay argument, which it has since withdrawn for purposes of the Motion, and the substantiation of Grand's equipment cost

calculations, which raise rather than show the absence of genuine material factual disputes. First, the Government takes issue with the 681 days of delay that Grand relies upon for its cost calculations in the Equipment worksheet. *See* App. 140. The Government makes a persuasive argument that Grand's claimed delay of 681 days is implausible, *see* ECF No. 30-1 at 47, but the argument does the opposite of what the Government intends: it reveals that there is a genuine, material factual dispute. As repeatedly stated throughout this opinion, the exact length of compensable delay, if any, requires a factual presentation at trial.

Second, the Government alleges that Grand has not sufficiently supported its truck overhead rates—for instance, by omitting the total value of the trucks and the depreciation methods that may support the daily rate. *See id.* The Government urges that Grand must "prov[e] the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation." ECF No. 40 at 9 (citing *ACLR*, 162 Fed. Cl. at 614). That is true enough, but "it is not essential that the amount [of damages] be ascertainable with absolute exactness or mathematical precision . . . ." *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001); *see also Locke*, 283 F.2d at 524 ("The amount may be approximated if a reasonable basis of computation is afforded.").

The Government has not shown that truck overhead rates, as a matter of law, must be established by a particular method or through particular evidence. *Cf. ACLR*, 162 Fed. Cl. at 614 (holding that FAR 52.212-4(l) governed plaintiff's damages claim and required proof of charges using a standard record keeping system). Here, Mr. Grandstaff testified about the Equipment costs related to trucks, including what inputs were used to develop the rates. *See* App. 293–96 (Grandstaff Dep. Tr. at 111:1–114:1). The Government may take the position that such testimony does not prove the Equipment costs "with sufficient certainty," *ACLR*, 162 Fed. Cl. at 614, and it

may attempt to establish that proposition through cross-examination or its own witness testimony. Either way, it is a factual matter that should be tested at trial. At this stage, the Government's lack-of-substantiation argument highlights rather than establishes the absence of a factual dispute as to Grand's ability to prove damages for Equipment costs.

* * *

In light of the parties' factual disputes over damages in the categories of direct subcontractor costs; financing, interest, and fees; overhead costs; profit; and certain Materials and Equipment costs, ascertaining damages in these categories is more appropriately reserved for resolution at trial. Trial will permit the Court to thoroughly and accurately weigh evidence establishing damages. *Pressly v. United States*, 172 Fed. Cl. 264, 267 (2024).

## IV. CONCLUSION

For these reasons, the Court **GRANTS IN PART** the Government's Partial Motion for Summary Judgment (ECF No. 30-1) with respect to the elevator extension work; the work associated with Modifications P00002, P00003, P00005, and P00006; and the Materials cost for "additional cost for roof due to six months of delays in reconstruction." It **DENIES IN PART** the Motion with respect to all other direct subcontractor costs; financing, interest, and fees; profit; overhead costs; and the surviving Materials and Equipment costs. Moreover, per Grand's representations, its claims for lost profits and unabsorbed home office overhead, including expenses arising from its home office, are **WITHDRAWN**. The parties shall submit a joint status report by no later than **September 4, 2026**, proposing next steps for litigating the remaining claims.

**SO ORDERED.**

Dated: August 14, 2026

*/s/ Kathryn C. Davis*
KATHRYN C. DAVIS
Judge